I/S
21 Days

**FEE PAID**

1   JUSTIN T. BERGER (SBN 250346)
2   jberger@cpmlegal.com
    EMANUEL B. TOWNSEND (SBN 305373)
3   etownsend@cpmlegal.com
4   **COTCHETT, PITRE & McCARTHY, LLP**
    840 Malcolm Road
5   Burlingame, CA 94010
6   Telephone: (650) 697-6000
    Facsimile: (650) 697-0577
7
8   *Attorneys for Relators*

| FILED |
| CLERK, U.S. DISTRICT COURT |
| 8/21/20 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: ___CS___ DEPUTY |

9
10                    **IN THE UNITED STATES DISTRICT COURT**
11              **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
12

CV20-7736-MWF(PDx)

13   **UNITED STATES OF AMERICA,** *ex*
     *rel.* **[UNDER SEAL] and [UNDER**
14   **SEAL],**

     Case No.

15                          Plaintiffs,
16
17              v.
18   **[UNDER SEAL],**
19                          Defendants.
20

**COMPLAINT FOR MONEY
DAMAGES AND CIVIL PENALTIES
FOR VIOLATIONS OF THE
FEDERAL FALSE CLAIMS ACT, §§
3729(A)(1)(A); (A)(1)(B); AND
(A)(1(G);**

**JURY TRIAL DEMANDED**

21
22              **[FILED IN CAMERA AND UNDER SEAL**
23               **PURSUANT TO 31 U.S.C. § 3730(b)(2)]**
24
25
26
27
28

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**COMPLAINT**

1   JUSTIN T. BERGER (SBN 250346)
2   jberger@cpmlegal.com
    EMANUEL B. TOWNSEND (SBN 305373)
3   etownsend@cpmlegal.com
4   **COTCHETT, PITRE & McCARTHY, LLP**
    840 Malcolm Road
5   Burlingame, CA 94010
6   Telephone: (650) 697-6000
    Facsimile: (650) 697-0577
7
8   *Attorneys for Relators*
9
10                **IN THE UNITED STATES DISTRICT COURT**
11            **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
12

| | |
|---|---|
| 13   **UNITED STATES OF AMERICA,** *ex rel.* **CURT CANALES and DOUG** | Case No. |
| 14   **BELLOWS,** | **COMPLAINT FOR MONEY DAMAGES AND CIVIL PENALTIES** |
| 15                              Plaintiffs, | **FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT, §§** |
| 16                    v. | **3729(A)(1)(A); (A)(1)(B); AND (A)(1(G);** |
| 17 | |
| 18   **NATIONWIDE MEDICAL, INC.,** a California Corporation; and DOES 1-100, | |
| 19   inclusive, | |
| 20                    Defendants. | **JURY TRIAL DEMANDED** |

21
22              **[FILED IN CAMERA AND UNDER SEAL**
23               **PURSUANT TO 31 U.S.C. § 3730(b)(2)]**
24
25
26
27
28

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**COMPLAINT**

# **TABLE OF CONTENTS**

Page No.

I.    INTRODUCTION ........................................................................................ 1

II.    JURISDICTION AND VENUE ................................................................. 2

III.   PARTIES .................................................................................................... 3

IV.   BACKGROUND ........................................................................................ 3

     A.    The United States Medicare System .............................................. 3

     B.    Diagnostic Sleep Tests and Treatments ........................................ 5

     C.    Nationwide Medical, Inc. ............................................................... 6

V.    APPLICABLE LAW ................................................................................. 8

     A.    The Federal False Claims Act ........................................................ 8

     B.    Federal Anti-Kickback Statute ....................................................... 8

     C.    Special Medicare Rules Re Sleep Labs & DME Suppliers .......... 13

     D.    Defendant's Fraudulent Schemes ................................................. 14

           1.    Kickbacks ........................................................................... 14

           2.    Illegal Pass-Through Billing/Kickbacks .......................... 18

           3.    Third-Party Sales Reps Refer Sleep Labs to Nationwide
               in Violation of AKS ........................................................... 19

VI.   CAUSES OF ACTION ............................................................................ 20

     FIRST CAUSE OF ACTION
          On Behalf of the United States  Federal False Claims Act,
          Presenting False Claims
          31 U.S.C. § 3729(a)(1)(A) ............................................................ 20

     SECOND CAUSE OF ACTION
          On Behalf of the United States  Federal False Claims Act,
          Making or Using False Records or Statements
          Material to Payment or Approval of False Claims
          31 U.S.C. § 3729(a)(1)(B) ............................................................ 20

     THIRD CAUSE OF ACTION
          (In the Alternative)
          On Behalf of the United States,
          Retention of Proceeds to Which Not Entitled (Against All Defendants)
          31 U.S.C. § 3729(a)(1)(G) ............................................................ 21

VII.  PRAYER FOR RELIEF ......................................................................... 22

DEMAND FOR JURY TRIAL ........................................................................ 23

COMPLAINT                                            i

# I.   **INTRODUCTION**

1.   Relators CURT CANALES and DOUG BELLOWS (collectively "Relators") bring this action on behalf of the United States to recover losses sustained by the Medicare program as a result of the operations of Defendant NATIONWIDE MEDICAL, INC. ("NMI" of "Defendant").  Defendant's fraudulent billing scheme included the submission of thousands of false claims to Medicare, at the expense of taxpayers.

2.   Defendant is a durable medical equipment provider ("DME") that specializes in the resupply of medical device components that treat sleep apnea, including Continuous Positive Airway Pressure ("CPAP") devices and Bilevel Positive Airway Pressure ("BiPAP").  CPAP and BiPAP devices help to regulate breathing and prevent infrequent or shallow breathing while a patient is asleep.

3.   Defendant has defrauded Medicare by carrying out the following three fraudulent schemes.

4.   First, Defendant pays illegal cash kickbacks to Physicians and sleep labs that refer patients to it for CPAP/BiPAP devices and accessories.

5.   Second, Defendant engages in illegal pass-through billing by billing Medicare and Medicaid, as well as private insurers (Anthem, Blue Shield, Cigna, etc.), for CPAP/BiPAP therapy it did not perform and then pays a commission (kickback) to the Durable Medical Equipment company that performed the CPAP/BiPAP therapy.

6.   Third, Defendant pays its sales reps a commission for each CPAP/BiPAP device or accessory sold.  The sales reps are hired as W2 employees as a decoy in order to appear to stay within legal guidelines, but are actually compensated as independent contractors (commission only without hourly pay).  The commission payments to the sales representatives constitute kickbacks in violation of the federal Anti-Kickback Statute.

7.   This is not the first time Defendant has committed Medicare fraud.  In May, 2009, NMI was sanctioned by HHS and the Department of Justice for violating

1  rules requiring that they not improperly purchase lists of sleep apnea patients for the
2  purpose of soliciting them for resupply items.  In addition to paying a fine of $2.5
3  million in connection with a settlement of these charges it was also required to reaffirm
4  its commitment to complying with federal regulations and institute a number of
5  programs to ensure compliance.  This agreement, known as a Corporate Integrity
6  Agreement, governed NMI's behavior until 2014, and set forth a number of specific
7  penalties for failure to comply.

8       8.     In 2013, another relator brought a False Claims Act lawsuit against
9  Defendant in the Central District of California.  The case, *United States ex rel. Joseph*
10 *Abeyta v. Nationwide Medical, Inc.*, CV-13-9143-RSWL(MANx), alleged Defendant
11 billed Medicare for medically unnecessary CPAP supplies and supplies not provided.
12 Defendant's fraudulent conduct took place while it was subject to the previously
13 mentioned Corporate Integrity Agreement.  The case settled in 2018.

14      9.     This is a *qui tam* action for violation of the federal False Claims Act (31
15 U.S.C. §§ 3150 *et seq.*) to recover the millions of dollars out of which Defendant has
16 defrauded Medicare, in addition to treble damages, statutory penalties, and Relator's
17 attorneys' fees and costs.  Non-public information personally known to Relators serves
18 as the basis for this action.  On information and belief, the United States had no
19 knowledge of the schemes being perpetrated by Defendant, as detailed below, until
20 Relators informed them of the details of the schemes.

21 **II.    JURISDICTION AND VENUE**

22      10.    This Court has jurisdiction over the claims raised in this complaint under
23 31 U.S.C. §§ 3730(b) and 3732(a) which confer jurisdiction on this Court for actions
24 brought under the federal False Claims Act and authorize nationwide service of
25 process.

26      11.    Venue is proper under 31 U.S.C. § 3732(a), as Defendant transacts
27 business in the Central District of California.
28 ///

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

III. **PARTIES**

12.     The Plaintiff in this action is the UNITED STATES OF AMERICA ("United States"), by and through Relators CURT CANALES and DOUG BELLOWS. At all times material to this action, CMS was an agency of Plaintiff United States of America and administered the Medicare program, which paid benefits from Federal Government funds.  CMS provided benefits to qualified recipients which included payment of claims to Defendants for their CPAP/BiPAP devices and services.  CMS paid Defendant's claims based upon Defendant's false representations, among other things, that the claims being made were not the result of unlawful kickbacks or for services Defendant did not itself perform.

13.     Defendant NATIONWIDE MEDICAL, INC. is a California Corporation. Its principal office is in Agoura Hills, California.

IV. **BACKGROUND**

A. **The United States Medicare System**

14.     Medicare is a federally-funded health care program that provides medical insurance coverage to qualified residents of the United States who are aged 65 and older, younger people with permanent or congenital disabilities, or those who meet other special criteria like the End Stage Renal Disease program.  The vast majority of Medicare's costs are paid by United States citizens through their taxes.  In addition to paying for medical expenses such as doctor visits and hospital stays, Medicare pays for home medical devices and supplies for eligible Medicare recipients.

15.     Title XVII of the Social Security Act establishes the Medicare Program (technically, the "Health Insurance for the Aged and Disabled Program").  *See* 42 U.S.C. §§ 1397 *et seq.*

16.     The United States provides reimbursement for Medicare claims from the Medicare Trust Funds through the Centers for Medicare & Medicaid Services ("CMS"), which is the operating division of the United States Department of Health & Human Services ("HHS").  CMS, in turn, contracts out to Medicare Administrative

1  Contractors ("MACs") to review, approve, and pay Medicare claims received from

2  health care providers, including suppliers.

3      17.    Payments are typically made directly to health care providers rather than

4  the patient, as Medicare recipients routinely assign their right to payment to the health

5  care provider, such as physicians and medical device suppliers.  Once a Medicare

6  recipient assigns their right to payment to a provider, the provider then submits its bill

7  directly to Medicare for payment.

8      18.    To bill Medicare, a provider must submit an electronic or hard-copy claim

9  form called a CMS-1500 form.  When submitting the form, the provider must certify

10  that the treatment was "medically indicated and necessary for the health of the

11  patient."

12      19.    The CMS-1500 form requires the provider to state, among other things,

13  the procedure(s) for which it is billing Medicare, the provider number, the identity of

14  the patient, and a short narrative explaining the diagnosis and the medical necessity of

15  services that the provider rendered.

16      20.    All healthcare providers must comply with all applicable statutes,

17  regulations, and guidelines in order to be reimbursed by Medicare.  Providers have a

18  duty to have knowledge of the relevant statutes, regulations, and guidelines regarding

19  coverage for Medicare services.  For example, Medicare reimburses only reasonable

20  and necessary medical services furnished to beneficiaries and excludes from payment

21  services that are not reasonable and necessary.  *See* 42 U.S.C. § 1395y(a)(1)(A); *see*

22  *also* 42 C.F.R. § 411.115(k).  Providers must also assure that they provide medical

23  services to Medicare recipients "economically and only when, and to the extent,

24  medically necessary."  42 U.S.C. § 1320c-5(a)(1).

25      21.    Because it is not realistically feasible to review medical documentation

26  before paying each claim, MACs generally make payment under Medicare based on

27  the providers' certification on the Medicare claim form that the services in question

28  were "medically indicated and necessary for the health of the patient."

**B.**   **Diagnostic Sleep Tests and Treatments**

22.     Sleep labs claim to help detect and treat sleep disorders, such as sleep apnea (a potentially lethal condition where the patient stops breathing during sleep) and narcolepsy (a syndrome characterized by abnormal sleep tendencies).  .

23.     Sleep labs use diagnostic tests, such as a polysomnogram, to detect sleep disorders.  A polysomnogram (informally referred to simply as a "sleep test" in this Complaint) is a multiple-component test that continuously measures and electronically records physiological activities while a patient sleeps.  The data is then analyzed by qualified medical personnel to determine whether the patient has a sleep disorder.  Generally, the sleep test is conducted in one night.  Polysomnographic sleep tests are covered and reimbursed by Medicare Part B.  42 C.F.R. § 410.10(e); 42 C.F.R. § 410.33(a).

24.     If sleep apnea is detected during the sleep test, the patient returns for a second night for a continuous positive airway pressure ("CPAP") titration test to determine the appropriate pressure required to alleviate the apnea.  In the titration test, a sleep technician will set varying levels of air pressure on the CPAP device and evaluate the results to determine the optimum pressure for the patient.

25.     In some situations, when severe sleep apnea is discovered during the first part of a sleep test, the second half of the night may be used for the CPAP titration test, such that both tests are completed in the same night.  Such testing is generally called a "split night with CPAP testing."

26.     Breathing devices, such as a CPAP device or a bi-level positive airway pressure (BiPAP) device, may be prescribed if sleep apnea is diagnosed as a result of a sleep test.  The devices deliver pressurized air through tubing to a nasal mask or pillow fitted to a patient's head.  CPAP and BiPAP devices are covered by Medicare under certain conditions and are both classified as DME.  Medicare National Coverage Determination Manual, Pub. 100-03, § 240.4.

/ / /

1    27.    Providers bill Medicare for polysomnography services performed using
2  Medicare CPT codes.  All polysomnography services consist of two components: the
3  administration of the test (the technical component) and the physician's interpretation
4  of the test (the professional component).

5    28.    Sleep technicians (also called sleep technologists) assist in the evaluation
6  and care of patients with sleep disorders by assisting with the clinical assessment and
7  physiological monitoring and testing of patients. A registered polysomnographic
8  technologist ("RPSGT") is a fully-trained sleep technologist who has met the rigorous
9  requirements to become credentialed by the Board of Registered Polysomnographic
10  Technologists.

11    **C.    Nationwide Medical, Inc.**

12    29.    NMI is a privately held company headed by CEO David Siegel, who
13  recently succeeded his father, Howard Siegel.

14    30.    In 2009, NMI paid a $2 million fine to the United States to settle claims
15  involving payments by NMI of kickbacks to providers in exchange for referrals.  As
16  part of the resolution of that proceeding, NMI and Howard Siegel entered into a
17  Settlement Agreement and Corporate Integrity Agreement ("CIA") with the Office of
18  the Inspector General for the Department of Health and Human Services ("OIG").
19  According to the OIG, between September 30, 2004, and June 25, 2007, NMI and
20  Howard Siegel allegedly entered into services agreements with sleep labs and other
21  health care providers (collectively, "sleep labs") in multiple States.  Under the
22  agreements, Nationwide provided CPAP devices and associated equipment to the sleep
23  labs and paid the sleep labs a "set-up fee" each time a sleep lab provided Nationwide's
24  device and equipment to a patient.  Nationwide submitted claims for reimbursement to
25  Medicare for the delivery of the CPAP device and associated equipment, as well as for
26  the monthly rental of the CPAP device and replacement supplies.  These arrangements
27  constituted violations of federal anti-kickback statutes, and resulted in a $2 million
28  payment from NMI and Siegel to the United States.

1    31.    The Corporate Integrity Agreement that NMI entered into with the United

2    States placed further obligations on NMI to ensure "***compliance with the statutes,***

3    ***regulations, and written directives of Medicare, Medicaid, and all other Federal***

4    ***health care programs***."  (Emphasis added).  The CIA became in or around May 2009,

5    and was in effect for five (5) years.

6    32.    Among other things, the CIA required NMI to maintain a Compliance

7    Officer.  It also required NMI draft and implement a Code of Conduct setting forth,

8    *inter alia*, its "commitment to full compliance with all Federal health care program

9    requirements, including its commitment to prepare and submit accurate claims

10   consistent with such requirements."

11   33.    The CIA further required NMI to report to the OIG overpayments or other

12   "matter[s] that a reasonable person would consider a probable violation of criminal,

13   civil, or administrative laws applicable to any Federal health care program for which

14   penalties or exclusion may be authorized" within 30 days of learning of the matter.

15   34.    Finally, under the CIA, NMI agreed to stipulated penalties of between

16   $1,000 and $5,000 per day for failure to abide by the CIA's requirements, and agreed

17   that any material breach of the CIA constitutes grounds for exclusion from federal

18   healthcare programs.

19   35.    In sum, NMI was required by law and specific contractual obligation to

20   have a heightened understanding and appreciation of its obligations as a participant in

21   the federal and state healthcare programs, and is currently under heightened scrutiny

22   for other illegal, unrelated business practices.

23   36.    In 2018, Defendant entered into a settlement agreement with the United

24   States to settle FCA claims brought against it for allegedly billing Medicare for

25   medically unnecessary CPAP supplies and supplies not provided.  Defendant's

26   fraudulent conduct took place while it was subject to the Corporate Integrity

27   Agreement. *See United States ex rel. Joseph Abeyta v. Nationwide Medical, Inc.*, CV-

28   13-9143-RSWL(MANx).

## V.   APPLICABLE LAW

### A.   The Federal False Claims Act

37.    The FCA provides for the award of treble damages and civil penalties for, *inter alia*, knowingly presenting or causing to be presented false or fraudulent claims for payment to the United States government and for knowingly making or using false records or statements material to false or fraudulent claims paid by the United States. 31 U.S.C. §§ 3729(a)(1), (2); 31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B) (as amended).

38.    The FCA provides, in pertinent part, that a person who:

(a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; or

(a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; … is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461note; Public Law 104- 410),  plus 3 times the amount of damages which the Government sustains.

31 U.S.C. § 3729.

39.    For purposes of the FCA, the terms "knowing" and "knowingly" mean that a person, with respect to information:  (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information.  The FCA does not require proof of specific intent to defraud.  *See* 31 U.S.C. § 3729(b)(1).

40.    The standard of proof under the FCA is preponderance of the evidence. 31 U.S.C. § 3731(d).

### B.   Federal Anti-Kickback Statute

41.    Enacted in 1972, the main purpose of the federal Anti-Kickback Statute, 42 U.S.C. §1320a-7b, is to protect patients and federal health care programs from fraud and abuse by curtailing the corrupting influence of money on health care decisions.

/ / /

42.     When a DME pays kickbacks to a medical provider, such as a sleep lab, in order to induce the medical provider to refer patients to the DME, it fundamentally compromises the integrity of the provider/patient relationship.  Government-funded healthcare programs, such as Medicare and Medicaid, rely upon health care providers to decide what treatment and/or medical equipment is appropriate and medically necessary for patients, and, therefore, payable by that healthcare program.  As a condition of its reimbursement, government healthcare programs require that individuals and companies must render their services without the conflict of receipt of a kickback.

43.     The federal Anti-Kickback Statute and analogous state laws make it a crime to knowingly and willfully offer, pay, solicit or receive any remuneration to induce a person:

> (1) to refer an individual to a person for the furnishing of any item or service covered under a federal health care program; or

> (2) to purchase, lease, order, arrange for or recommend any good, facility, service, or item covered under a Federal health care program.

42 U.S.C. §1320a-7b(b)(l) and (2).

44.     The term "any remuneration" encompasses any kickback, bribe, or rebate, direct or indirect, overt or covert, in cash or in kind. 42 U .S.C. § 1320a-7b(b)(1 ). Violations of the federal Anti-Kickback Statute must be knowing and willful.  42 U.S.C. §1320a-7b(b)(l).

45.     The federal Anti-Kickback Statute has been interpreted by federal courts to cover any arrangement where one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals.  *See U.S. v. Celgene Corp.*, 226 F. Supp. 3d 1032, 1053 (C.D. Cal. 2016)

46.     Proof of an explicit *quid pro quo* is not required to show a violation of the Anti- Kickback Statute.

47.     In addition to the various laws and regulations all pharmaceutical and medical device companies are required to follow, the Government also offers industry

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**COMPLAINT**                                                                                          9

1   guidance in an effort to police the marketing activities of the pharmaceutical industry.

2       48.     For instance, the Office of the Inspector General of the Department of

3   Health and Human Services ("HHS-OIG"), in May 2003, issued its Compliance

4   Program Guidance for Pharmaceutical Manufacturers, a document meant to provide an

5   overview of the fundamental elements of a pharmaceutical manufacturer compliance

6   plan, and identifies and discusses specific risk areas.

7       49.     HHS-OIG has stated that "antikickback statute ultimately turns on a

8   party's intent, it is possible to identify arrangements or practices that may present a

9   significant potential for abuse.  Initially, a manufacturer should identify any

10  remunerative relationship between itself (or its representatives) and persons or entities

11  in a position to generate federal health care business for the manufacturer directly or

12  indirectly.  Persons or entities in a position to generate federal health care business

13  include, for example, purchasers, benefit managers, formulary committee members,

14  group purchasing organizations (GPOs), physicians and certain allied health care

15  professionals, and pharmacists.  The next step is to determine whether any one purpose

16  of the remuneration may be to induce or reward the referral or recommendation of

17  business payable in whole or in part by a Federal health care program." HHS-OIG

18  Guidance to Pharmaceutical Manufacturers, issued May 2003, p. 23734.

19      50.     A violation of the federal Anti-Kickback Statute constitutes a felony

20  punishable by a maximum fine of $25,000, imprisonment up to five years, or both.  A

21  party convicted under the federal Anti-Kickback Statute may be excluded (i.e., not

22  allowed to bill for any services rendered) from Federal health care programs. 42 U.S.C.

23  § 1320a-7(a).

24      51.     In addition to criminal penalties, a violation of the Anti-Kickback Statute

25  can also subject the perpetrator to exclusion from participation in federal health care

26  programs (42 U.S.C. § 1320a-7(b)(7)), civil monetary penalties of $50,000 per

27  violation (42 U.S.C. § 1320a-7a(a)(7)), and three times the amount of remuneration

28  paid, regardless of whether any part of the remuneration is for a legitimate purpose. 42

1  U.S.C. § 1320a-7a(a).

2      52.    HHS has published safe harbor regulations that define practices that are

3  not subject to prosecution or sanctions under the federal Anti-Kickback Statute

4  because such practices would unlikely result in fraud or abuse.  *See* 42 C.F.R. §

5  1001.952.  However, only those arrangements that precisely meet all of the conditions

6  set forth in the safe harbor are afforded safe harbor protection.  None of the practices at

7  issue here meet these safe harbor regulations.

8      53.    Compliance with the Anti-Kickback Statute is a condition of payment

9  under the Medicare and Medicaid programs, and that condition applies regardless of

10  which entity is submitting the claim to the government.

11      54.    Claims that arise from a kickback scheme violate the False Claims Act for

12  two separate and distinct reasons: (1) claims seeking payment for services or

13  prescriptions tainted by kickbacks are "factually false" because compliance with the

14  Anti-Kickback Statute is a condition of payment; and (2) health care providers must

15  certify in their provider enrollment agreement that they will comply with the Anti-

16  Kickback Statute as a condition of payment.

17      55.    Claims that result from a kickback scheme are *per se* false because the

18  Anti- Kickback Statute prohibits the government from paying for services or

19  pharmaceuticals tainted by kickbacks.  No further express or implied false statement is

20  required to render such infected claims false, and none can render the claim legitimate.

21      56.    The False Claims Act imposes liability where a defendant knowingly

22  causes such tainted claims to be presented to the Medicare, Medicaid, or other

23  government funded healthcare programs.

24      57.    Second, as a prerequisite to participating in federally-funded health care

25  programs, providers must certify (expressly or, through their participation in a

26  federally-funded health care program, impliedly) their compliance with the federal

27  Anti-Kickback Statute.

28      58.    DME companies, Physicians, hospitals, and pharmacies enter into

1   Provider Agreements with CMS in order to establish their eligibility to seek

2   reimbursement from the Medicare Program.  As part of that agreement, without which

3   DME companies, physicians, hospitals and pharmacies may not seek reimbursement

4   from Federal Health Care Programs, the provider must sign the following certification:

6   > I agree to abide by the Medicare laws, regulations and program, instructions
7   > that apply to [me]. The Medicare laws, regulations, and program
    > instructions are available through the [Medicare] contractor. I understand
8   > that payment of a claim by Medicare is conditioned upon the claim and the
    > underlying transaction complying with such laws, regulations, and program
9   > instructions (including, but not limited to, the Federal Anti-Kickback
    > statute and the Stark law), and on the [provider's] compliance with all
10  > applicable conditions of participation in Medicare.

12   Form CMS-855-S (for Durable Medical Equipment, Prosthetics, Orthotics and

13   Supplies (DMEPOS) Suppliers)

14        59.    Moreover, as a prerequisite to participating in the various state Medicaid

15   programs, providers must certify (expressly or, through their participation in the state-

16   funded health care program, impliedly) their understanding of and compliance with

17   both the federal Anti-Kickback Statute and applicable state anti-kickback laws.

18        60.    Even in the absence of an express certification of Compliance, a party that

19   submits a claim for payment impliedly certifies compliance with all conditions of

20   payment, i.e., that it is properly payable.

21        61.    Consequently, if a party pays a kickback to induce the referral of patients

22   to a particular CPAP provider, it renders false the submitter's implied or express

23   certification of compliance that the resulting claim complies with the requirements of

24   the Anti-kickback Statute.

25        62.    On March 23, 2010, as part of the Affordable Healthcare for America Act,

26   the Anti-Kickback Statute was amended to clarify that all claims resulting from a

27   violation of the Anti-Kickback Statute are a violation of the Federal False Claims Act.

28   42 U.S.C. § 1320a-7(b)(g).

C.  **Special Medicare Rules Re Sleep Labs & DME Suppliers**

63.  CMS has long been concerned about the existence of a financial relationship between the entity performing the sleep and titration tests and the entity providing DME based on those tests. As such, CMS has implemented rules to prevent reimbursement when such a relationship exists. The regulations (entitled "payment prohibition") state:

> No Medicare payment will be made to the supplier of a CPAP device if that supplier, or its affiliate, is directly or indirectly the provider of the sleep test used to diagnose the beneficiary with obstructive sleep apnea.

42 C.F.R. § 424.57(f).

64.  CMS defined "affiliate" as "a person or organization that is related to another person or organization through a compensation arrangement or ownership." 42 C.F.R. § 424.57(a); see also 73 Fed. Reg. 69856, 69860 (Nov. 19, 2008).

65.  As CMS explained in the Federal Register when publishing the final rule:

> We believe that Medicare beneficiaries and the Medicare program are vulnerable if the provider of a diagnostic test has a financial interest in the outcome of the test itself. This creates incentive to test more frequently or less frequently than is medically necessary and to interpret a test result with a bias that favors self-interest. In the specific context of this rule, we believe that the provider of a sleep test has self-interest in the result of that test if that provider is affiliated with a supplier of the CPAP device that would be covered by the Medicare program.

73 Fed. Reg. 69856 (Nov. 19, 2008).

66.  An exception to this rule exists "if the sleep test is an attended facility-based polysomnogram." 42 C.F.R. § 424.57(f). The regulation defines "attended facility-based polysomnogram" as "a comprehensive diagnostic sleep test including at least electroencephalography, electro-oculography, electromyography, heart rate or electrocardiography, airflow, breathing effort, and arterial oxygen saturation furnished in a sleep laboratory facility in which a technologist supervises the recording during sleep time and has the ability to intervene if needed." 42 C.F.R. § 424.57(a).

67.  This exception applies to a properly attended test performed according to Medicare regulations—i.e., a test performed in an approved location by a licensed or

certified technologist. A sleep test that is not attended by an appropriately qualified individual, or that occurs in an unapproved facility or patient's home, does not qualify as an "attended facility-based polysomnogram." 42 C.F.R. § 410.33(c), § 410.44(g)(2), § 410.33(g)(12). Accordingly, such tests are subject to the payment prohibition in 42 C.F.R. § 424.57(f).

### D. **Defendant's Fraudulent Schemes**

#### 1. **Kickbacks**

68. Defendant is a supplier of CPAP and BiPAP (collectively referred to as "CPAP") machines used to treat sleep apnea. Defendant enters into sham Equipment Consignment and Services Agreements ("Sham Agreements") with Physicians and sleep labs. Through these sham agreements, Defendant pays the sleep lab to refer patients to it for CPAP machines.

69. Sometimes Defendant agrees to a per-patient referral fee; other times it agrees to pay the sleep lab a fixed amount each month in exchange for CPAP referrals. The amount of fee depends on how many referrals the sleep lab promises to provide.



Kickback Example: Per-Patient Referral Fee

3. Compensation. As compensation, Nationwide will pay Sleep Lab (i) a one-time fee of $125.00 per patient for the Services and (ii) $60.00 per patient for Follow-Up Services (as defined in Exhibit A). On or before 10 days of each calendar month, Nationwide will pay Sleep Lab for the Services rendered by the Sleep Lab in the preceding month. Sleep Lab will not be entitled to additional compensation or reimbursement for expenses incurred in the delivery of Services. Sleep Lab will not bill patients or third-party payors for any Services.

70. Referral payments violate the federal Anti-Kickback Statute ("AKS") and the Stark Law

71. "A payment violates the AKS if 'one purpose of the payment' was to induce prescriptions, 'even if the payments were also intended to compensate for professional services.' *United States v. Kats*, 871 F.2d 105, 108 (9th Cir. 1989)

1  (internal citation and quotation marks omitted)."  *U.S. v. Celgene Corp.*, 226 F. Supp.

2  3d 1032, 1053 (C.D. Cal. 2016)

3  72.    Here, the sham Equipment and Consignment agreements are designed to

4  induce the sleep labs to prescribe CPAP devices and refer patients to Defendant.  42

5  C.F.R. § 424.57(f) prohibits such agreements precisely because Medicare fears that

6  any financial arrangement between a sleep lab and CPAP supplier will lead to the

7  "unnecessary utilization of sleep tests."  *See* 73 FR 69726-01.

8  73.    In 2010, Congress amended the Anti-Kickback Statute to state expressly

9  that claims that arise from its violation constitute false claims under the FCA. See 42

10  U.S.C. 1320a–7b(g) ("[A] claim that includes items or services resulting from a

11  violation of [the Anti-Kickback Statute] constitutes a false or fraudulent claim for

12  purposes of [the FCA.]").

13  74.    Here, each claim Defendant submitted to Medicare or Medicaid for CPAP

14  machines or therapy provided to patients procured by Defendant's illegal kickbacks

15  constitutes a false claim.

16  75.    Defendant's illegal kickbacks also violate the Physician Self-Referral

17  Law.  The Physician Self-Referral Law, [42 U.S.C. § 1395nn], commonly referred to

18  as the Stark law, prohibits physicians from referring patients to receive "designated

19  health services" payable by Medicare or Medicaid from entities with which the

20  physician or an immediate family member has a financial relationship, unless an

21  exception applies.

22  76.    CPAP devices and accessories are considered durable medical equipment

23  and supplies.  Durable medical equipment and supplies are considered "designated

24  health services" under the Stark Law.

25  77.    Financial relationships include both ownership/investment interests and

26  **compensation arrangements**.

27  / / /

28  / / /

78.   Under the Stark Law, a "compensation arrangement" is "any arrangement involving any remuneration between a physician (or an immediate family member of such physician) and an entity…"   42 U.S.C.A. § 1395nn(h)(1).

79.   The sham Equipment and Consignment agreements are "compensation arrangements."  As such, Defendant violates the Stark Law each time it pays a sleep lab or physician a referral fee pursuant to the Sham Agreements.  Like the AKS, Defendant's Stark Law violations render false each claim it submits to Medicare of Medicaid for CPAP machines or therapy provided to patients referred to it pursuant to a Sham Agreement.

80.   Defendant has paid illegal kickbacks pursuant to Sham Agreements to the following physicians, medical groups, and sleep labs:

- Advanced Sleep Medicine Services, Inc.: Encino, CA;
- Jiva Health:  Concord, CA; Antioch, CA Walnut Creek, CA;
- Sehatu Sleep Clinic: Roseville, CA;
- Valley Sleep Specialists Inc. Arnold Rugama, MD:  Fresno, CA;
- California Center for Sleep Disorders: Alameda, CA; Concord, CA; Daly City, CA; Fremont, CA; San Francisco, CA; Pleasanton, CA;
- Dr. Man Kong Leung, MD:  Pleasanton, CA;
- Serramonte Pulmonary, Asthma And Sleep Clinic Inc.:  Pinole, CA;
- Respiratory Therapy Services, PLLC:  Bohemia, NY;
- Northeast Pulmonary and Sleep Associates:  Live Oak, TX

81.   In addition to violating the AKS and Stark Law, these referral payments also violate 42 C.F.R. § 424.57(f), which is specific to CPAP suppliers and sleep labs.  42 C.F.R. § 424.57 provides special payment rules for items furnished by providers of durable medical equipment, prosthetics, orthotics and supplies ("DEMPOS").  Defendant is a DEMPOS supplier subject to 42 C.F.R. § 424.57.  Specifically, 42 C.F.R. § 424.57(f) provides that:

/ / /

> <u>No Medicare payment will be made </u>to the **supplier** of a **CPAP device**
> if that supplier, or its **affiliate**, is **directly** or **indirectly** the provider of the
> **sleep test** used to diagnose the beneficiary with obstructive sleep apnea.
> *See* 42 C.F.R. § 424.57 (f) (emphasis added).[1]

82.     42 C.F.R. § 424.57(f) was enacted in 2008 due to concerns "that Medicare beneficiaries and the Medicare program are vulnerable if the provider of a diagnostic test has a financial interest in the outcome of the test itself" due to "the potential for unnecessary utilization of sleep tests."  See 73 FR 69726-01.

83.     Defendant supplies CPAP devices to Medicare and Medicaid beneficiaries.  Both CPAP and BiPAP are considered "CPAP" devices under 42 C.F.R. § 424.57(a) and therefore subject to the 42 C.F.R. § 424.57(f).

84.     Pursuant to 42 C.F.R. § 424.57(a), "Affiliate" means a person or organization that is related to another person or organization through a compensation arrangement or ownership.  Sleep labs become "affiliates" of Defendant through the sham Equipment Consignment and Services Agreements.

85.     Pursuant to 42 C.F.R. § 424.57(a), "sleep test" means an attended or unattended diagnostic test for a sleep disorder whether performed in or out of a sleep laboratory.  The 'provider of the sleep test' is the individual or entity that directly or indirectly administers and/or interprets the sleep test and/or furnishes the sleep test device used to administer the sleep test.  Here, the referring Sleep labs "directly" provide "sleep tests" as defined by 42 C.F.R. § 424.57(a).

86.     The referral payments Defendant makes to its sleep lab "affiliates" for "sleep tests" administered on Medicare and Medicaid patients are direct violations of 42 C.F.R. § 424.57(f).  Defendant violates 42 C.F.R. § 424.57(f) "knowingly" as that term is defined by the FCA, 31 U.S.C. § 3729(b).  Defendant then knowingly submits claims to Medicare and Medicaid for the CPAP devices it supplies in violation of 42 C.F.R. § 424.57(f).  Each claim Defendant makes to Medicare or Medicaid for a CPAP

---

[1] BiPAP devices qualify as CPAP devices under 42 C.F.R. § 424.57(a)

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

1  devices it supplies to patients referred to it pursuant to the Sham Agreements is a false

2  claim.

3  　　　　　　　　**2.   Illegal Pass-Through Billing/Kickbacks**

4  　　　　87.   Defendant has engaged in a fraudulent "pass-through billing" scheme

5  whereby it bills Medicare and Medicaid for CPAP therapy it did not perform and then

6  pays a commission (kickback) to the company that performed the CPAP therapy.

7  　　　　88.   The scheme works as follows, Home Medical Equipment/Durable

8  Medical Equipment companies (DMEs), including C2C Sleep Solutions, Calabasas,

9  CA; Impakt Medical, Fair Oaks, CA; Guardian Medical, San Jose, CA; and CPAP

10  Services, San Jose, CA, market themselves to physicians as in-network providers

11  (Medicare, Medicaid, and private insurance) of CPAP.  As a result of their marketing,

12  physicians refer patients to these entities for CPAP.

13  　　　　89.   These DMEs market themselves to physicians as in-network even when

14  they know they are not.  By falsely marketing themselves as in-network, the DMEs are

15  able to increase the volume and profitability of their CPAP business by (1) procuring

16  referrals for patients that would normally be referred to CPAP suppliers that are

17  legitimately in-network; and (2) billing insurers at the much higher out-of-network

18  reimbursement rates.  When these DMEs cannot bill for the CPAP at the higher out-of-

19  network rate, they provide CPAP and then Defendant Nationwide, which is in-network

20  with most major insurers, bills for the CPAP at the in-network rate (Medicare,

21  Medicaid, or private insurance).  Nationwide then splits the reimbursement with the

22  DME.

23  　　　　90.   This pass-through billing scheme violates the FCA because:  (1)

24  Nationwide bills Medicare and Medicaid for CPAP therapy it does not perform; (2) the

25  referral payments Nationwide makes to the DME companies for pass-through referrals

26  violate the AKS and, consequently, result in false claims in violation of the FCA; and

27  (3) the referral payments Nationwide makes to the DME companies result in an illegal

28

1  compensation arrangement under the Stark Law and, consequently, result in false

2  claims in violation of the FCA.

3           **3.**    **Third-Party Sales Reps Refer Sleep Labs to Nationwide in**

4                 **Violation of AKS**

5        91.    Defendant utilizes a sales force of independent contractors to market its

6  CPAP devices and accessories to physicians and sleep labs.  Defendant pays its sales

7  representatives a commission for each CPAP device and accessory sold.  Defendant

8  does not pay its sales representatives a base salary or provide them any employments

9  benefits.  Defendant does not provide its sales representatives any training nor assign

10  them to any specific sales territory.  Defendant often does not enter into written

11  employment contracts with its sales representatives and does not otherwise define the

12  expectations it has for its sales representatives.  Instead, Defendant allows its sales

13  representatives to work independently.  The only instruction Defendant gives its sales

14  representatives is to market and sell CPAP devices and accessories to physicians and

15  sleep labs.  Defendant's sales representatives work free from its control and direction,

16  using their own networks of physicians and sleep labs to market and sell Defendant's

17  CPAP devices and accessories.

18        92.    Although Defendant refers to its sales representatives as "employees," it

19  does not exercise the level of control over them necessary to establish a bona fide

20  employer-employee relationship.  As such, the commission payments Defendant

21  provides to its sales representatives do not fall within the AKS employee safe harbor

22  provision.  Instead, the commission payments Defendant pays its sales representatives

23  constitute illegal kickbacks designed solely to induce the referral patients for CPAP

24  devices and accessories.

25        93.    Each claim Defendant makes to Medicare or Medicaid for CPAP devices

26  and accessories administered to patients referred to it through Nationwide's network of

27  independent sales representatives constitutes a false claim.

28  / / /

## VI. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**On Behalf of the United States**
**Federal False Claims Act, Presenting False Claims**
**31 U.S.C. § 3729(a)(1)(A)**

94. Relators incorporate herein by reference and realleges all of the allegations stated in this Complaint.

95. Defendant knowingly (as defined in 31 U.S.C. § 3729(b)(1)) presented or caused to be presented false claims for payment or approval to an officer or employee of the United States.

96. Defendant knowingly caused to be presented false records and statements, including but not limited to claims, bills, invoices, requests for reimbursement, and records of services, in order to obtain payment or approval of charges by the Medicare program for supplies that were never provided to beneficiaries.

97. Defendant knowingly made, used, and caused to be made and used false certifications that claims, and all documents and data upon which those claims were based, were accurate, and were supplied in full compliance with all applicable statutes and regulations.

98. The conduct of Defendant violated 31 U.S.C. § 3729(a)(1)(A) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

### SECOND CAUSE OF ACTION
**On Behalf of the United States**
**Federal False Claims Act, Making or Using False Records or Statements**
**Material to Payment or Approval of False Claims**
**31 U.S.C. § 3729(a)(1)(B)**

99. Relators incorporate herein by reference and realleges all of the allegations stated in this Complaint.

100. Defendant knowingly (as defined in 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

1       101.   Defendant knowingly made, used, or caused to be made and used false

2   records and statements, including but not limited to claims, bills, invoices, requests for

3   reimbursement, and records of services, in order to obtain payment or approval of

4   charges by the Medicare programs for supplies that were never provided to

5   beneficiaries.

6       102.   Defendant knowingly made, used, and caused to be made and used false

7   certifications that claims, and all documents and data upon which those claims were

8   based, were accurate, and were supplied in full compliance with all applicable statutes

9   and regulations.

10       103.   The conduct of Defendant violated 31 U.S.C. § 3729(a)(1)(B) and was a

11   substantial factor in causing the United States to sustain damages in an amount

12   according to proof.

### THIRD CAUSE OF ACTION
#### (In the Alternative)
### On Behalf of the United States, Retention of Proceeds to Which Not Entitled
#### (Against All Defendants)
### 31 U.S.C. § 3729(a)(1)(G)

16       104.   Relators incorporate herein by reference and realleges all of the

17   allegations stated in this Complaint.

18       105.   In the alternative, Defendants knowingly made, used, or caused to be

19   made or used, a false record or statement material to an obligation to pay or transmit

20   money or property to the Government, or knowingly concealed or knowingly and

21   improperly avoided or decreased an obligation to pay or transmit money or property to

22   the Government.

23       106.   As discussed above, Defendants received far more money from the

24   Medicare and Medicaid programs than they were entitled to.  Defendants knew that

25   they received more money than they were entitled to and avoided their obligation to

26   return the excess money to the Government.

27   ///

28   ///

107.   The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(G) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

## VII.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, by and through the Relators, prays judgment in its favor and against Defendant as follows:

1.   That judgment be entered in favor of Plaintiff UNITED STATES OF AMERICA *ex rel.* DOUG BELLOWS and CURT CANALES, and against Defendant NATIONWIDE MEDICAL, INC. according to proof, as follows:

    a.   On all Causes of Action, damages as provided by 31 U.S.C. § 3729(a)(1), in the amount of:

        i.   Triple the amount of damages sustained by the Government;

        ii.   Civil penalties of Eleven Thousand Dollars ($11,000.00) for each false claim;

        iii.   Recovery of costs, attorneys' fees, and expenses;

        iv.   Pre- and post-judgment interest;

        v.   Such other and further relief as the Court deems just and proper;

2.   Further, Relators, on their own behalf, requests that they receive such maximum amount as permitted by law, of the proceeds of this action or settlement of this action collected by the United States, plus an amount for reasonable expenses incurred, plus reasonable attorneys' fees and costs of this action.  Relators request that the percentage be based upon the total value recovered, including any amounts received from individuals or entities not parties to this action.

Dated: August 20, 2020      **COTCHETT, PITRE & McCARTHY, LLP**

By: _____
                    JUSTIN T. BERGER
                    EMANUEL B. TOWNSEND
                    *Attorneys for Relator*

**<u>DEMAND FOR JURY TRIAL</u>**

Relators DOUG BELLOWS and CURT CANALES hereby demand a jury trial on all issues so triable.

Dated: August 20, 2020

**COTCHETT, PITRE & McCARTHY, LLP**

By: _____
JUSTIN T. BERGER
EMANUEL B. TOWNSEND
*Attorneys for Relator*

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

